UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

Criminal Action No. 13-20368
Honorable Victoria A. Roberts
Magistrate Judge David R. Grand

v.

OSCAR LINARES, M.D.,

Defendant.
_________________________________/

**REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE [43]**

## I. RECOMMENDATION

Defendant Oscar Linares, M.D. ("Linares") is charged in a Superseding Indictment with thirteen counts of unlawful distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and ten counts of health care fraud, in violation of 18 U.S.C. § 1347. [31]. On February 13, 2015, Linares filed a motion to suppress evidence that was seized when search warrants were executed at his office and residences. [43]. The government filed a response [49], to which Linares filed a reply. [50]. The motion has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). [46]. For the following reasons, the Court RECOMMENDS that Linares's motion [43] be DENIED.

## II. REPORT

### A. Background

Linares owned and operated the Monroe Pain Center (the "Center") out of an office suite

located in Monroe, Michigan. [43, Ex. 1 at 5].[1] The Center purportedly specialized in the diagnosis and treatment of various neurological conditions. [*Id.*]. As a part of his treatment protocol, Linares extensively prescribed numerous pain medications to his patients, including OxyContin, Percocet, Percodan, Diluadid, Vicodin and Alprazolam. [*Id.* at 7, 11-14]. All of these medications are listed as controlled substances pursuant to the Controlled Substances Act, 21 U.S.C. § 801, *et seq*.

Beginning in December 2009, Michigan state and federal authorities commenced an investigation into the Center's operations after receiving complaints from regional pharmacies that Linares was prescribing excessive dosages of prescription narcotics to his patients. [*Id.* at 7]. An examination of the Michigan Automated Prescription System ("MAPS") and the Ohio Automated Rx Reporting System ("OARRS"), the databases that track statewide prescriptions of Schedule II-V controlled substances, revealed some staggering statistics.[2] According to MAPS, Linares prescribed 85,357 dosage units of Schedule II narcotics and 394,685 dosage units of Schedule III narcotics in 2007. [*Id.* at 11]. These figures dramatically increased by 2009, when

---

[1] Exhibits 1, 2 and 3 to Linares' motion are the affidavits of Drug Enforcement Administration ("DEA") Task Force Officer Jason S. Davis ("Davis") (Exs. 1 and 2) and DEA Special Agent Frank Finken ("Finken") (Ex. 3) in support of applications for warrants search to search the Center (Ex. 1), and Linares's residences in Monroe (Ex. 2) and Plymouth (Ex. 3), Michigan. The background allegations stated herein are taken from the respective affidavits.

[2] The Controlled Substances Act:

> creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in any of the Act's five schedules. The Act places substances in one of five schedules based on their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision. Schedule I contains the most severe restrictions on access and use, and Schedule V the least.

*Gonzales v. Oregon*, 546 U.S. 243, 250 (2006) (internal citations omitted); *see also Volkman v. DEA*, 567 F.3d 215, 221 (6th Cir. 2009).

Linares prescribed 520,124 dosage units of Schedule II narcotics (an increase of over 600 percent) and 714,713 dosage units of Schedule III narcotics (an increase of over 180 percent). [*Id.*]. In a six-month period alone, from January through June 2010, Linares prescribed 364,679 dosage units of Schedule II narcotics, a rate that would have yielded an 850 percent increase from his annual Schedule II total in 2007. [*Id.*]. Still, those statistics are dwarfed by those from the four-month period from June through October 2010, when, after combining the figures from MAPS and OARRS, Linares prescribed more than two-million dosage units of Schedule II narcotics. [*Id.*].

The DEA officers did not rely on statistics alone to support search their warrant applications. Although Linares had access to MAPS and OARRS, which would have allowed him to independently monitor his patients' prescription histories, the officers averred that he nevertheless continued to prescribe narcotics to:

- multiple patients who lived at the same address and who received prescriptions for the same drugs;
- patients who travelled long distances from outside of Michigan;
- patients who filled the same prescriptions in multiple pharmacies;
- patients who filled partial prescriptions in Michigan and the remaining prescriptions in Ohio;
- patients who obtained multiple prescriptions for the same drugs from different doctors at the same time; and
- patients who paid for their prescriptions in cash.

According to investigators, these are all telltale signs of a "large scale" operation engaged in the prescription of "controlled substances for non-legitimate purposes." [*Id.* at 6, 10].

Additionally, from December 2009 through February 2011, investigators conducted four undercover operations within the Center and Linares's former medical office. [*Id.* at 20-32].

Posing as prospective patients, undercover agents, and one confidential informant, recounted similar experiences. Linares's office staff typically used his prescription pad to dispense high dosages of Schedule II or III narcotics after administering limited to no physical examinations or diagnostic testing. On the whole, most appointments lasted between one to two hours, the undercover operatives paid cash for the office visit fee, and they never met with Linares. [*Id.*]. In fact, during the few times Linares examined them, whether remotely or in person, he only minimally reviewed the patients' medical records and conducted only cursory physical examinations. [*Id.*]. On only one occasion did the office staff inform an undercover agent that "he was being dismissed as a patient and given a referral to an addiction specialist," after he reported exhausting his prescription for 120 dosage units of Norco within 16 days. [*Id.* at 28].

An undercover FBI confidential informant (the "informant") whose involvement in the investigation is described in Davis's affidavit, provided evidence that could fairly be characterized as Linares's apparent indifference to his patients' drug abuse. During his first office visit (which lasted approximately five hours), the informant briefly communicated with Linares through a video monitor. [*Id.* at 31]. After informing Linares that "he previously obtained the prescription drug Oxycontin by purchasing it on the 'Street' and it was the only thing that worked," the doctor replied that, "he was glad to know what worked and that it saves a lot of time." [*Id.*]. The informant then received a prescription for 60 dosage units of Oxycontin 80 mg without any further inquiries from the doctor or his staff. [*Id.*]. On his second office visit, the informant again indicated that he had purchased Oxycontin "off the street" without any reply from the office staff. [*Id.*]. The following ensued:

> An electronic impulse test was conducted on the [informant's] neck. The [informant] was required to submit to a urine test. The [informant], acting on the advice of [FBI Special Agent] Brennan added an ampoule of Oxycodine into the urine to have a positive test. No issue of the urine test

> was brought up by the staff or doctor. The [informant] saw Dr. Linares only for a few seconds via the video monitor. During the video conference with Dr. Linares, the [informant] asks if Dr. Linares can show prior treatments so that the [informant's] insurance will pay for the Oxycontin 80 mg with not having any prior medication prescribed. Dr. Linares says that he can and to talk to the receptionist. The [informant] received a prescription for 60 dosage units of 80mg Oxycontin and paid $235 as a co-pay.

[*Id.* at 31]. The informant finally met with Linares in person on his fifth and final office visit after waiting for six hours. [*Id.* at 32]. The informant noted that the visit "lasted for approximately two minutes," and after asking for more pain medications, he "received prescriptions for 60 dosage units of Oxycontin 80 mg and 120 dosage units of Percocet 10/325 mg." [*Id.*].

Investigators observed the following activities outside the Center:

> (g) [a] large designated parking lot that was full of vehicles from Michigan, Ohio, even vehicles from Illinois, Pennsylvania, Kentucky, and Tennessee; (h) some patients arriving in rental cars; (i) several vehicles showed up with one to three passengers, with all of them going inside the office and leaving a while later, with prescriptions, receipts and paperwork in hand; (j) patients were seen leaving the office and meeting up with other patients, or people waiting in the parking lot, or in the McDonald's fast food restaurant parking lot, and then going their own way.

[43, Ex. 2 at 35].[3] Davis averred that, "[b]ased on this information, [he] knows that physicians operating 'prescription mills' see the types of activities previously described," and further noted that, "Dr. Linares has been observed on several occasions transporting a briefcase containing unknown items from [his Monroe residence] to the [Center]." [*Id.*].

Davis cited interviews with several pharmacists who recounted that Linares's patients

[3] Exhibit 1 to Linares's motion (Davis's affidavit regarding the Center) is missing pages 33-35. However, Exhibit 2 to the motion (Davis's affidavit regarding one of Linares's residences), which does contain those pages, appears to be identical to Ex. 1 in terms of the factual background provided. Linares does not argue that the original copy of Exhibit 1 was missing the pages; indeed, he refers to "*The affidavit* for *the searches* of the [] Center and [the Monroe residence]. [43 at 7 (emphasis added)].

paid for their prescriptions with large amounts of cash; that many of them were former patients of doctors whose DEA prescription licenses had been revoked after illicitly prescribing narcotics; and that some of them had travelled long distances from their homes to fill their prescriptions. [43, Ex. 1 at 15-16]. Investigators also questioned two of Linares's patients, Stuart Stein ("Stein") and Teresa Bonds ("Bonds"). Stein stated that he became Linares's patient after his prior doctor surrendered his DEA prescription license. [*Id.* at 17]. Out of six office visits, Stein saw Linares only once. [*Id.*]. He further indicated that office staff never asked him for his prior medical records before prescribing him high dosage units of prescription narcotics. [*Id.*].

Bonds informed investigators that she had been recruited by her neighbor, Phillis Berry, to obtain prescription narcotics at the Center. [*Id.* at 19]. During her only office visit, Bonds alleged that she never underwent any diagnostic testing or medical exams before Linares's office staff prescribed her 120 dosage units of Percocet and 60 dosage units of Oxycontin. [*Id.*].

Additionally, Davis's affidavit included a summary of an interview with Latonya Mills, one of Linares's medical assistants. She reported that Linares had negligible interactions with his patients and that he routinely directed office staff, including Mills, to use his prescription pad to dispense narcotics. [*Id.* at 19]. Mills reported that, by July 2010, Linares typically saw 230 patients in a single day and that approximately 75 percent of his patients paid for their prescriptions out-of-pocket. [*Id.* at 17-18]. Moreover, Mills reported that employees advised Linares that they observed his patients selling their pain medication in the Center's parking lot, but that Linares simply responded, "There is nothing I can do, I'm not the police." [*Id.* at 18].

On March 22, 2011, Davis applied for two warrants to search the Center and Linares's Monroe residence.[4] [43, Exs. 1, 2]. Addendums to each warrant application provided a list of

[4] The government acknowledges that task force officers also relied upon Davis's affidavit to

items to be seized including, all business and personal financial information related to Linares, his wife, Doctor Annmarie Daly, and his brother, Eduardo Linares, who served as the Center's chief executive officer; "[a]ll records relating to the ordering, maintenance, or dispensing of controlled substances;" all business and personal financial information related to the Center; computers; electronic storage media; and billing, treatment, and prescriptions records for 353 of Linares's patients. [43, Exs. 1, 2 Attachments B].

The magistrate judge approved the warrants to search the Center and Linares's Monroe residence. [*Id.*, Ex. 1, 2]. Authorities searched both locations on March 23, 2011, recovering, among other things, several cash-filled plastic bags, patient treatment records, financial records, computers, electronic storage devices, and three semi-automatic pistols. [*Id.*].

That same day, Special Agent Finken applied for a warrant to search Linares's residence located in Plymouth, Michigan.[5] [*Id.*, Ex. 3]. In support of the warrant application, Finken disclosed that DEA task force officers discovered the following items at Linares's Monroe home:

> a large amount of bulk cash, located in eight boxes, in a safe. Also two money counters were found, indicating a need to count large amounts of cash on a continuing basis. Very preliminary estimates indicated that the amount of cash is at least $300,000. This address is one of two residences used by Oscar Linares and his wife, Annmarie Daly.

[*Id.* at 1]. Investigators also found "financial documents of Oscar Linares and the Monroe Pain Center" after conducting a "trash pull" at the Plymouth residence. [*Id.* at 2]. As a result, Finken concluded that:

> [i]n light of the significant cash seizure from the Monroe residence on March 23, 2011, it is likely that additional bulk cash will be located at the family residence, where vehicles registered to Oscar Linares have been

---

apply for a warrant to search the Monroe residence of Linares's brother. [49 at 1, n.1]. That warrant is not the subject of the instant motion to suppress.

[5] Finken's affidavit incorporated Davis's earlier affidavit by reference. [43, Ex. 3 at 1].

> observed by agents on surveillance. Furthermore, given the high volume of cash patients at the Monroe Pain Center, even the large amount of cash seized at the Monroe residence does not begin to account for all of the cash taken in by the defendant's business. Further, financial investigation has not revealed CTRs for cash deposits into bank accounts over $10,000 that would account for the amount of cash receipts from the Monroe Pain Center. Since Oscar Linares kept a safe with a large amount of cash in his Monroe residence, it is likely that he will keep a safe for valuables at his Plymouth residence as well.

[*Id.* at 3]. After the magistrate judge approved the warrant, authorities search the Plymouth residence and seized, among other things, several computers, a box of miscellaneous documents and assorted jewelry. [*Id.*, Ex. 3]. Linares was then taken into custody and, as noted above, was eventually indicted on thirteen counts of unlawful distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), and ten counts of health care fraud, in violation of 18 U.S.C. § 1347. [31].

In his suppression motion, Linares argues that: (1) task force officers improperly seized the files of 343 of the 353 patients listed in the search warrant addendums because Davis's affidavit did not provide reasonable grounds to believe that those 343 records contained evidence of suspected criminal conduct; (2) the portion of the warrants seeking "[a]ll business and personal financial information" for himself and the Center was impermissibly overbroad; (3) the search warrants for the Monroe and Plymouth residences lacked sufficient probable cause to establish a nexus between those locations and the items the authorities expected to seize; (4) the search warrant for the Plymouth residence was inherently tainted by the illegality of the earlier search of his Monroe home; and (5) assuming the search warrants are invalid, the government may not rely on the exclusionary rule's "good-faith" exception to gain admittance of the seized items because the task force officers should have known that the warrants were legally deficient.

**B. Analysis**

As a preliminary matter, the Court declines to conduct an evidentiary hearing with respect to the instant motion because there are no "contested issues of fact going to the validity of the search [that] are in question." *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006) (citation and internal quotation marks omitted). Since Linares challenges the sufficiency of the allegations supporting the magistrate judge's probable cause determination, the instant motion strictly poses a legal question that can be appropriately resolved by evaluating "the information presented in the four corners of the affidavit[s]." *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006); *see also United States v. Knowledge*, 418 F. App'x 405, 408 (6th Cir. 2011) (stating that "[a] defendant is not entitled to an evidentiary hearing where his arguments are entirely legal in nature.").

Turning to the merits of Linares's specific arguments, the Court first finds that Davis's affidavit supplied the requisite probable cause to conduct the searches and seize the 343 patient files which were listed in the search warrant addendums, but not specifically discussed in the affidavits. The Fourth Amendment ensures "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. Const. amend. IV. The warrant requirement is the most effective safeguard of this right, and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* The Sixth Circuit Court of Appeals defines probable cause:

> "as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990), and is found to exist when there is "a 'fair probability' that evidence of a crime will be located on the premises of the proposed search." *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) (quoting *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990)). [In

> this regard, s]earch warrant affidavits must be judged based on the totality of the circumstances, rather than line-by-line scrutiny. *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) . . . "In order for a judicial officer to issue a warrant, law enforcement officials must present evidence from which the magistrate judge can conclude from the totality of the circumstances, 'including the "veracity" and "basis" of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

*Jackson*, 470 F.3d at 306.

Of the 353 patient files listed in the addendum to the search warrants, Davis's affidavit singled out the prescription histories of ten patients to demonstrate that Linares routinely prescribed high dosage units of narcotics without an objective medical basis. Contrary to Linares's contention, however, Davis's failure to include a prescription history analysis for the remaining 343 patients does not mean that the seizure of the related patient files violated his Fourth Amendment rights. *See United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (holding that "[t]here is no requirement that the government have evidence relating to each and every patient . . . to support the seizure of all of the [patient] files" in a particular case); *see also United States v. Hayes*, 794 F.2d 1348, 1356 (9th Cir. 1986) (where "officers possessed information concerning 58 cases of potential violations involving Schedule II drugs" the search warrant did not have to be "limited to those 58 patient files" because they "could fairly be considered as representative of more pervasive violations of the [Controlled Substances] Act.").

In any event, Davis's affidavit presented a detailed factual account that was more than sufficient to establish probable cause that Linares had been engaging in a wide-scale illicit prescription authorization practice including: complaints from local pharmacists; statements from one of Linares's medical assistants; patient interviews; statements from undercover officers and confidential informants; and investigators' first-hand observations. Viewed in the totality of

the circumstances, all of this information provided the magistrate judge with sufficient probable cause to authorize the seizure of any patient files discovered at the Center or Linares's residence. *See Hurwitz*, 459 F.3d at 473; *Hayes*, 794 F.2d at 1356.

This reasoning equally applies to Linares's assertion that the portion of the warrants seeking "[a]ll business and personal financial information" should be invalidated on overbreadth grounds. Pursuant to the Sixth Circuit precedent:

> "It is well-settled that items to be seized pursuant to a search warrant must be described with particularity to prevent the seizure of one thing under a warrant describing another in violation of the Fourth Amendment." *United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003) (citation and internal quotation marks omitted). "The chief purpose of the particularity requirement [is] to prevent general searches by requiring a neutral judicial officer to cabin the scope of the search to those areas and items for which there exists probable cause that a crime has been committed." *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 441 (6th Cir. 2006).

*United States v. Richard*, 659 F.3d 527, 536-37 (6th Cir. 2011). "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001). Where the alleged criminal conduct involves "fraudulent activity . . . [that] permeates an entire organization," the Sixth Circuit recognizes that "search warrants necessarily must authorize broad seizures of corporate records." *United States v. Speer*, 419 F. App'x 562, 572 (6th Cir. 2011); *see also Hurwitz*, 459 F.3d at 473.

Here, the supporting affidavits provided the magistrate judge with probable cause that Linares not only engaged in unlawful distribution of narcotics and healthcare fraud, but that his fraudulent conduct pervaded the entire medical practice. This is evident from the astronomical dosage units prescribed to the patients who visited the Center from far and wide, the high percentage of patients who paid cash, the cursory medical care provided by Linares and his staff,

the high dosage units of prescription narcotics dispensed to patients who exhibited patterns of drug abuse and diversion, and Linares's alleged refusal, on multiple occasions,[6] to terminate those patients who re-sold prescribed narcotics to third-parties.

Insofar as Linares raises the same objection to the language in the warrants allowing for the seizure of "[a]ny and all personal/computer(s)/computing systems(s)," his argument is likewise without merit. According to the Sixth Circuit, "[t]he prohibition of general searches is not to be confused with a demand for precise *ex ante* knowledge of the location and content of evidence . . . . The proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." *United States v. Richards*, 659 F.3d 527, 541 (6th Cir. 2011) (quoting *United States v. Meek,* 366 F.3d 705, 716 (9th Cir. 2004)). Given the wide-ranging scope of Linares's alleged illegal and fraudulent conduct, coupled with the limited information Davis and Finken had available to them regarding the contents of the electronic information stored on Linares's personal computer(s), it is nearly impossible to envision how the warrant could have been more narrowly tailored. *See id.* Moreover, since the Court has already determined that the warrant appropriately targeted Linares's "business and personal financial information," it was entirely permissible for the magistrate judge to infer that such records would likely be stored in electronic format on his personal computer(s) as well. *See United States v. Sherman*, 372 F. App'x 668, 676 (8th Cir. 2010) (upholding search warrant that permitted the seizure of "[a]ny and all electronic data

[6] The Court recognizes that Linares, on at least one occasion, refused to prescribe requested narcotics to an undercover agent. *See supra* at 4. However, at least for purposes of the probable cause affidavits, it does not negate the various instances described above where Linares failed to take appropriate action with respect to patients who he knew were engaging in unlawful narcotics activity. *See supra* at 4, 6. Nor does it negate all of the other substantial evidence described above implicating him in an unlawful narcotics distribution operation. *See supra* at 2-6.

processing and storage devices, computer and computer systems . . ." where other items enumerated in the warrant were "tied to the specific fraudulent practices suspected" and the identified computer records "were likely to contain evidence relevant to those suspect practices.").

Linares further maintains that the supporting affidavits did not establish any nexus between his residences and the evidence to be seized. The Court disagrees. Davis's affidavit specifically noted that investigators observed Linares "on several occasions transporting a briefcase containing unknown items from [his Monroe residence] to [the Center]" and that a "trash pull" from his brother's house uncovered bank statements indicating that Linares had paid the mortgage on his Monroe residence with proceeds from his medical practice. [43, Ex. 2 at 34-35]. Additional trash pulls from Linares's Plymouth residence unearthed items from his medical practice and "two Charter One bank receipts for accounts relating to the Monroe Pain Center." [*Id.*, Ex. 2 at 36]. Finally, Finken referenced his own law enforcement experience and attested that:

> given that Oscar Linares and Annmarie Daly appear to have a continuing marriage, and that financial documents bearing their names have been found in 'trash pulls' at both the family residence in Monroe and the family residence in Plymouth, I conclude that the same type of financial records and assets are likely to be found at both residences.

[43, Ex. 3 at 2]. Altogether, these statements furnished the magistrate judge with reasonable grounds to believe that the items sought by the government would be located at Linares's Monroe and Plymouth residences. *See Abboud*, 438 F.3d at 572 (holding that the magistrate judge properly relied on a government agent's "experience in his assessment of the probable location of the evidence" since "records of illegal business activity are usually kept at either a business location or at the defendant's home" and "personal financial records are also usually

stored at a person's home or place of business.").

Relying on the above arguments, Linares concludes that the cash seizure of $300,000 from his Monroe home violated the Fourth Amendment, and that Finken improperly relied upon that discovery to establish the requisite probable cause to later search his Plymouth residence. As discussed in the preceding paragraph, however, the Court sees it differently. The ultimate flaw in Linares's reasoning is that he presupposes the task force officers effectuated an unconstitutional search of his Monroe home when this is simply not the case. *See United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000) (holding that since "the first warrant was valid, the second and third search warrants withstand constitutional scrutiny because any items seized under these subsequent warrants can no longer be suppressed as 'fruit of the poisonous tree.'"). At any rate, under the independent source rule, Davis's statement that investigators discovered "two Charter One bank receipts for accounts relating to the Monroe Pain Center" at Linares's Plymouth home, "on its own created probable cause sufficient to support the search warrant." *United States v. Krushinki*, 131 F. App'x. 478, 485 (6th Cir. 2005). Thus, none of the items seized from the Plymouth residence should be suppressed.

Finally, even assuming that all three warrants were in fact deficient, none of the seized items should be suppressed because the executing officers acted under a good-faith belief that the warrants contained sufficient probable cause to search the Center and Linares's residences. While the good-faith exception to the Fourth Amendment's exclusionary rule requires an officer's "objectively reasonable" good-faith reliance on a subsequently invalidated search warrant, *United States v. Leon*, 468 U.S. 897, 923 (1984), the United States Supreme Court has highlighted four situations where the exception is inapplicable:

> first, if the issuing magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for

> his reckless disregard for the truth;" second, if "the issuing magistrate wholly abandoned his judicial role;" third, if the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or in other words, where "the warrant application was supported by [nothing] more than a 'bare bones' affidavit," and, fourth, if the "warrant may be so facially deficient—i.e., failing to particularize the place to be searched or the things to be seized."

*United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996) (citations omitted) (quoting *Leon*, 468 U.S. at 914-15, 923). Where the good-faith exception is in question, "[t]he burden rests on the government to prove that [the executing officer's] reliance on a warrant was objectively reasonable." *U.S. v. Rissew*, 580 Fed. Appx. 35, 36 (2nd Cir. 2014). The government satisfies its burden where "thoughtful and competent judges" might disagree as to whether the facts alleged established probable cause. *Leon*, 468 U.S. at 926.

Linares asserts that the warrants in this case fall within the fourth category because they are "patently overbroad," i.e., they failed to particularize the items to be seized. [43 at 22]. However, a review of both Davis's and Finken's affidavits demonstrates that the warrants were not "so facially deficient in describing the items to be seized that the [task force officers] could not reasonably presume [them] to be valid." *United States v. Richards*, 659 F.3d 527, 542 (6th Cir. 2011) (quotation omitted). As stated above, the affidavits presented first-hand accounts of the Center's highly suspect daily operations, a thorough analysis of the nature and history of Linares's massive prescription distribution operation (including evidence of him prescribing narcotics without verifying patient need, and prescribing narcotics to patients who he knew were engaging in unlawful narcotics activity), and documentary evidence that Linares managed his medical practice's finances, at least to some extent, from his Monroe and Plymouth residences. With this information in hand, the task force officers, at the very least, possessed an "objectively reasonable" good-faith belief that Linares directed an illicit scheme to fraudulently distribute

prescription narcotics and that his "business and personal financial information," along with "[a]ny and all personal/computer(s)/computing systems(s)," permissibly fell within the scope of the warrants. Consequently, "this is not a situation where 'even a cursory reading of the warrant . . . would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal.'" *Id.* at 542-43 (quoting *Groh v. Ramirez*, 540 U.S. 551, 564 (2004)). Thus, even if the warrants themselves were deficient, the government has satisfied its burden of showing that the good-faith exception applies such that none of the seized evidence should be suppressed.

## III. CONCLUSION

For the aforementioned reasons, the Court RECOMMENDS that Linares's motion to suppress evidence [43] be DENIED.

Dated: May 4, 2015
Ann Arbor, Michigan

s/David R. Grand
DAVID R. GRAND
United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via email addresses the court has on file.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

Dated: May 4, 2015